IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

In re:

Jonathan H. Horsfall,                                                                    (Chapter 7)

        Debtor.                                                                      Case No. 10-12596

First Weber Group, Inc.

        Plaintiff,

v.                                                                                               Adv. No. 10-00179

Jonathan H. Horsfall

        Defendant.

MEMORANDUM DECISION

    Jonathan Horsfall ("defendant") filed for relief under chapter 7 on April 5, 2010. On July 9, 2010, First Weber Group, Inc ("First Weber") filed this adversary proceeding to determine the nondischargeability of its claim. A trial was held on April 13, 2011.

    The following facts were proved at trial. The defendant was, and currently is, licensed by the State of Wisconsin as a real estate broker. On May 5, 2001, he entered into an independent contractor agreement ("the agent agreement") with First Weber to work as a realtor associate. Pursuant to the agent agreement, the defendant agreed to "abide by all applicable governmental laws, rules and regulations; the policies outlined the First Weber Group *Policy Book*."

1

On February 27, 2002, Robert Call, an acquaintance of the defendant and self-proclaimed entrepreneur, executed a "residential listing contract" with First Weber for a property located at 118 Overlook Terrace in Marshall, Wisconsin ("Overlook property"). This was one of several similar contracts between Call and First Weber. Defendant signed the listing contract as the listing agent. The listing contract set forth two relevant provisions that granted First Weber the exclusive right to sell the property. The first, more general, provision stated that First Weber had the exclusive right to sell the Overlook property until August 31, 2002 at which time the listing contract expired. The more specific provision prohibited Call from selling to a "protected buyer" within one calendar year from the date that the listing contract expired. I infer that this prohibition is routinely lifted when the commission owed under the expired listing contract is tendered to the broker (First Weber). A "protected buyer" is defined by the listing contract as any potential buyer who had "either negotiated to acquire an interest in the Property or submitted a written offer to purchase." During the original term of the contract, the defendant served as First Weber's listing agent for the property, and absent a subsequent agreement (and none was identified) would have been entitled to a percentage of any commission paid to First Weber during the one-year exclusion period following expiration.

On August 8, 2002, Hugo, Rosalina, and Veronica Acosta (hereinafter the "Acostas") by their agent Sylvester Garcia submitted an offer to purchase the Overlook property. The offer to purchase required that the transaction close by August 30, 2002. Had the transaction closed before this date, First Weber would have received a commission on the sale, part of which would have been payable to the defendant. Notwithstanding, on August 28, 2002, Richard Malsch, manager of the DeForest office for First Weber, participated in a phone call with Robert Call. Although the substance of their conversation is disputed, the conversation ended with Malsch

2

and Call agreeing to expire all real estate listings that Call had with First Weber. Immediately after the call, Malsch instructed the defendant as listing agent to execute an "amendment to listing contract," which effectively expired all of Call's listings with First Weber. Defendant and Call signed the amendments that the defendant prepared on August 28, 2002.

On September 1, 2002, the defendant ceased working for First Weber and began working as a realtor for his own realty brokerage company, Picket Fence Realty ("Picket Fence"). The company had been registered in Wisconsin as a limited liability company on April 29, 2002. On September 4, 2002, the Acostas and Call signed a cancellation agreement and mutual release of their accepted offer to purchase.

On October 8, 2002, the Acostas and Call executed a second offer to purchase and acceptance for the Overlook property on a form bearing a Picket Fence Realty heading. The transaction closed on October 28, 2002. The settlement statement, issued on a U.S. Department of Housing and Urban Development form, indicated that the property was encumbered by a first and second mortgage, as well as various federal and state tax liens. To clear those encumbrances and convey clear title Call paid $19,156.07 to the closing agent and received no cash as seller. Picket Fence received $6,000 at the closing, which was represented by defendant as a commission.

Six years later on October 28, 2008, First Weber commenced an action in Dane County Circuit Court ("state court") against both the defendant and Robert Call. In that intervening time Robert Call had filed for bankruptcy in this district and received a discharge. In late 2009, First Weber moved for summary judgment against the defendant on theories of conversion and

3

tortious interference with a contract.[1] On January 28, 2010, the state court entered a judgment[2] in favor of First Weber in the amount of $11,213.53.[3]

Most disputed at the trial were the events that gave rise to the final sale of the Overlook property. Testimony was taken from three witnesses—the defendant, Robert Call and Richard Malsch. The defendant credibly testified that he has never had any ill-will or animosity towards First Weber. At all times, the defendant believed his duties and obligations to First Weber under both the agent agreement and under Call's listing contracts were terminated when the contracts themselves were cancelled or expired.

In October, 2002, the defendant was contacted by Veronica Acosta, who was seeking a realtor to help her parents (who do not speak English) find a home. Coincidently at this time the defendant testified his company, Picket Fence, was Robert Call's listing agent for the Overlook property. The defendant showed the Acostas several properties for purchase, before submitting on the Acostas behalf, a second offer to purchase the Overlook property dated October 8, which was accepted by Call on that same day. The transaction closed on October 28, 2002.

Call denies being aware of any duties that he owed to First Weber after his listings were expired on August 28, 2002. His claimed ignorance of the one-year exclusion period and the nature of protected buyers is incredible in light of Call's business and real estate experience. He denies hearing the term "protected buyer" prior to the day of the trial. And he testified that the defendant did not tell him that he was prohibited from selling to certain buyers except through

---

[1] Probably because Robert Call filed for bankruptcy relief on July 22, 2004, and discharged his debt, First Weber moved for summary judgment against only the defendant.
[2] More discussion of the state court order is included in my prior decision dated March 1, 2011, denying plaintiff summary judgment in this adversary proceeding.
[3] While we are not precluded from revisiting this damage amount, First Weber has filed a proof of claim in the same amount to which no objection has been filed and it is therefore deemed allowed. 11 U.S.C. 502(a).

4

First Weber after his listing contracts were expired. Call claimed to believe that all ties with First Weber had been severed when the listing contracts were expired. Call signed both the listing contract with First Weber, and the amendment to the listing contract, each of which feature those terms prominently.

Call also testified that the defendant induced him to expire his listings with First Weber and list his properties to Picket Fence. However, no listing contracts with Picket Fence were made part of the evidence in this case and testimony about their existence was attenuated and vague. This was at least in part due to the six-year delay between the events and the request for production initiated in First Weber's state court lawsuit. Call testified that the defendant explained to him that it would be cheaper for Call to pay him, than to pay the contracted brokerage commission. Call also testified that because he and the defendant were friends, he decided at some time (it is unclear whether before or after August 28, 2002) to list his properties with Picket Fence. I doubt the veracity of these recollections, because Call seemed to remember so little else in similar detail.

On cross-examination, Call testified that the sale to the Acostas scheduled for August 30 did not close because the Acostas had cancelled their offer to purchase prior to the listing contract's expiration. However, the written termination of the offer to purchase was dated September 4, 2002[4], one week after Call expired his listing contract with First Weber. In addition to this inaccuracy, Call denied that he was unable to produce clean title to the Overlook property during August, while the settlement statement from October 28 showed that Call had to pay in almost $20,000 to close the sale less than two months later.

---

[4] Robert Call actually signed the cancellation agreement and mutual release on September 11, 2002.

Malsch testified that the defendant, while at First Webber, was difficult to work with. The difficulties he described did not demonstrate any animus or disaffection of the defendant toward First Weber. On August 28, 2002, after Malsch spoke with Call regarding Call's listing contracts, he instructed the defendant to expire all Call's listing contracts early. First Weber's standard procedure is that upon the expiration of any listing contract, the listing agent is directed to provide a list of "protected buyers" to a departing seller, and explain to the seller that he is prohibited from selling to any buyer on the list for one calendar year except through the agency of First Weber. Malsch directed the defendant to perform his duty as the listing agent on Call's several listings—to "write up a list of exclusions" (e.g. "protected buyers") and give that list to Call. Because the defendant terminated his agency with First Weber within several days after these instructions, Malsch did not know whether the defendant even notified Call of a "protected buyer" list or alerted Call to his duties with respect to a list.

First Weber now argues that the defendant caused a "willful and malicious" injury to it, when he received the commission from Call for the sale of the Overlook property. Section 523(a)(6) provides that "A discharge under section 727…does not discharge an individual debtor from any debt—for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). To find that a debt is nondischargeable under this section, the plaintiff must establish that: (1) it sustained an injury caused by the defendant; (2) the injury caused was willful; and (3) the injury caused was malicious. *See Birriel v. Odeh*, 431 B.R. 807, 817 (Bankr. N.D. Ill. 2010). The burden is on First Weber to prove its case by a preponderance of the evidence. *See In re Martin*, 698 F.2d 883, 887 (7th Cir. 1983); *see also Grogan v. Garner*, 498 U.S. 279, 287 (1991).

Conversion, which was referred to specifically in § 17 of the prior Bankruptcy Act, but is included only generally in § 523(a)(6) of the Bankruptcy Code is usually acknowledged to be a proper basis for nondischargeability. And, First Weber continues to argue that the defendant is liable for conversion as well as tortious interference. Specifically First Weber contends that the defendant, acting as the agent for First Weber, improperly retained the portion of the commission that was owed to First Weber on October 28, 2002. Conversion is generally defined "as the wrongful exercise of dominion or control over a chattel." *Production Credit Ass'n of Chippewa Falls v. Equity Coop. Livestock Sales Ass'n*, 82 Wis.2d 5, 10 (Wis. 1978). In Wisconsin, a claim for conversion is established if the defendant: (1) controlled or took property belonging to another; (2) without the owner's consent; and (3) in a manner that seriously interfered with the owner's rights to possess the property. *Knox Enterprises, Inc. v. Jetzer*, 2010 WL 1881943, *4 (Wis.App. 2010).

The property controlled or taken in a claim for conversion must generally be identifiable and tangible in form. *See Maryland Staffing Services, Inc. v. Manpower, Inc.*, 936 F.Supp. 1494, 1507 (E.D. Wis. 1996); *see also Horbach v. Kaczmarek*, 288 F.3d 969, 978 (7th Cir. 2002) (noting that money could only support a claim for conversion, if the plaintiff could establish that the money at issue could be deemed a "specific chattel"). An exception to this rule permits recovery of certain intangible rights "where there is a conversion of a tangible thing in which intangible rights are merged." *See Manpower*, 936 F.Supp. at 1507. (citing RESTATEMENT (SECOND) OF TORTS § 242). Money, a form of intangible property, can only be converted if the defendant exercised control over a "specific, identifiable quantity of currency" that belonged to the plaintiff. *Id.* There is no evidence that currency was distributed at the October 28, 2002 closing.

7

First Weber argues that the defendant improperly converted monies that were owed to it from the sale of the Overlook property. Pursuant to the Acosta's initial offer to purchase, First Weber did have a right to receive a commission once the offer to purchase was accepted. This contract right to receive a commission, however, is deemed intangible property to which Wisconsin conversion law does not apply. *See Manpower, Inc.,* 936 F.3d at 1507 (finding that Wisconsin conversion law is based on the fiction that a plaintiff lost a tangible chattel, which defendant converted for its own use). The violation of a contract right to be paid, if one is established, does not equate to conversion on nonpayment.

After the listing contract gave First Weber the right to receive a commission, the defendant (or rather Picket Fence, but it makes no difference) received a $6,000 commission for a sale of Call's property.[5] The money received by the defendant as commission is also considered intangible property, unable to be converted. *See Manpower, Inc.,* 936 F.3d at 1507. Because there was no evidence that suggests the defendant kept any commission paid to him segregated from other funds, or retained what he did receive in an identifiable manner, the exception allowing money to be converted does not apply. All property allegedly converted by the defendant was intangible in form. For this reason, the plaintiff cannot establish that the defendant took any specific, tangible property from it, and accordingly cannot, as a matter of law, establish liability for conversion.

Going beyond "conversion" we must determine whether the defendant's conduct was "willful and malicious." The requirement of "willfulness," as defined by the U.S. Supreme Court, means "a deliberate or intentional injury." *Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998). To establish that an injury was "willful," there must be proof that the defendant intended to cause

---

[5] Defendant suggested, but did not assert strongly, that the commission may have been due from the purchaser and therefore in no sense property of First Weber.

8

the injury "and not simply 'the act itself.'" *Id.* at 61-62. The *Geiger* Court noted that to give the "willful and malicious" standard a broader interpretation, would be to except from discharge injuries derived from "[e]very traffic accident stemming from an initial intentional act" and every "knowing breach of contract." *Id.* at 62. Such an interpretation would be in conflict with the policy that "exceptions to discharge 'should be confined to those plainly expressed.'" *Id.* (citing *Gleason v. Thaw*, 236 U.S. 558, 562 (1915)). As a result, "negligent or reckless acts…do not suffice to establish that a resulting injury is 'willful and malicious.'" *Id.* at 64 (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 (1934)). Since *Geiger*, courts have routinely found that a debt arising from a knowing, or even intentional, breach of contract are not excepted from discharge under § 523(a)(6). *See In re Gelhaar*, 2010 WL 4780314 (Bankr. N.D. Ill. 2010) (breach of contract must also be "malicious" as well); *see Neiman v. Irmen*, 379 B.R. 299, 312-13 (Bankr. N.D. Ill. 2007) ("Intentional breach of contract, by itself, is insufficient for 'willful and malicious' injury"). Thus to establish "willfulness," plaintiff must establish that the defendant intended to injure First Weber by taking the commission from the sale of Overlook property, and that his actions amounted to more than a knowing breach of contract.

Although the Supreme Court has interpreted the "willful" element as requiring that a defendant *intend* the injury caused, it has never articulated the state of mind necessary to establish intent under § 523(a)(6). *In re Jacobs*, 2011 WL 304850 (Bankr. N.D. Ill. 2011). Evidence that the defendant either subjectively intended to injure the creditor, or knew that certain injury was substantially certain to occur from his acts, is sufficient to establish the requisite intent. *See In re Fairgrieves*, 426 B.R. 748 (Bankr. N.D. Ill. 2010); *see In re Basel-Johnson*, 366 B.R. 831 (Bankr. N.D. Ill. 2007); *see In re Butler*, 297 B.R. 741 (Bankr. C.D. Ill. 2003). The evidence offered to prove intent is generally circumstantial in nature. *See In re*

9

*Radcliffe*, 372 B.R. 401 (Bankr. N.D. Ind. 2007) (plaintiff must offer "at least circumstantial evidence that the [defendant] had a subjective state of mind to commit injury to a property interest of the creditor"). Although direct evidence may be presented, a defendant's wrongful intent may also be logically inferred from circumstantial evidence by the finder of fact. *See generally Matter of Sheridan*, 57 F.3d 627 (7th Cir. 1995) (permitting finders of fact to infer intent in cases that litigating the nondischargeability of a claim).

At trial, First Weber vehemently offered evidence that it believed reflected the defendant's intention to injure First Weber. Because the defendant denied all wrongdoing and his testimony reflected no animosity towards First Weber, and little other direct evidence of the defendant's intent exists, we are left to infer whether the defendant at the time of the injury possessed the requisite intent to harm First Weber. *See Radcliffe*, 372 B.R. at 419. I find that the evidence, as a whole, does not compel an inference that the injury sustained by First Weber was "willful" in nature. Nor did it result from the defendant's malice.

Robert Call and Richard Malsch agreed that First Weber would expire Call's listing contracts early on August 28, 2002. Malsch asked the defendant to write up a list of "protected buyers" to give to Call. It is unclear whether the defendant ever completed this task or whether Robert Call was ever told by the defendant that he was prohibited from selling to the Acostas for one year after his listing contract ended (that is to say prohibited from selling without paying a commission to First Weber). As a trained and licensed realtor, the defendant was aware of his duties as listing agent and should have known that Call's subsequent sale of the Overlook property to the Acostas violated Call's listing contract with First Weber. His apparent failure to provide a protected purchaser list would also be a breach of both the listing contract and the agent agreement.

10

First Weber's attempt through circumstantial evidence to demonstrate a scheme that Call and the defendant developed to deprive First Weber of its commission, relies too heavily on Call's generally incredible testimony to be successful. In late April, 2002, the defendant registered Picket Fence, a LLC he planned to operate in the future as a realty brokerage firm. Call claimed that he was lured away from First Weber by the defendant, on the promise of allowing Call to avoid paying the larger commission to First Weber. After Picket Fence began marketing the Overlook property, the Acostas contacted the defendant in regard to purchasing a home. There was no evidence that Call and the defendant entered into a written listing contract. Ultimately, the Acosta's submitted their second offer to purchase the Overlook property, which was almost immediately accepted by Call. This evidence standing alone, might support an inference that the defendant deprived First Weber of the commission on the sale.

However, more and differed evidence supports an inference that the defendant did not intend to cause an injury to First Weber. The defendant's testimony cast serious doubt on whether a scheme between Call and the defendant even existed. The defendant testified that the reason Call expired his listing contracts early with First Weber was because Call was unable to produce "clean title" to his property. Although Call denies this testimony, the settlement statement reflects evidence that Call indeed could not produce clean title to the Overlook property, and was forced to pay almost $20,000 into the closing to complete the sale. The defendant's testimony, corroborated by the settlement statement, successfully rebutted Call's version of the events.

As for the other evidence offered by First Weber, it too was rebutted by the defendant's testimony. The defendant credibly testified that he wanted the initial transaction between Call and First Weber to close. Had it closed, the defendant would have been entitled to a commission from that sale, and without the closing the defendant was not paid for the work performed on the

11

listing. What he received as commission on October 28 seems to approximate what he would have received under his agent agreement had the August 30 sale closed. There is no evidence that he took any steps to prevent First Weber from pursuing Call for additional commissions owed. He simply failed to collect it for First Weber when he knew or should have known that he should. Thus, from the evidence presented this court cannot infer that the defendant acted with the intent that his actions would cause injury to First Weber.

Likewise at trial, First Weber offered sufficient evidence to support a finding that the defendant breached his contractual duties to it. First Weber failed to recognize, however, that even if the defendant did breach his duties under the listing contract or agent agreement and failed to deliver to Call a list of "protected buyers" after the listing contract had been expired, such a breach, without more, does not rise to the level of "willfulness." *See Geiger*, 523 U.S. at 62 (knowing breach of contract was meant to fall outside the ambit of § 523(a)(6)).

I also find that all testimony offered by First Weber included vague recollections of the events that had occurred. Although Malsch testified that he first learned of the October, 2002, sale of the Overlook property some six months after it occurred, First Weber waited six years to pursue any remedies. This unexplained lapse in time only weakens the credibility of all evidence offered by First Weber, and contributes to its failure to meet its evidentiary burden.

Because I cannot find that the defendant's actions resulted in a willful injury to First Weber, a finding of "malice" is not necessary. Nevertheless, "malice" in the Seventh Circuit requires proof of: (1) a wrongful act; (2) done intentionally; (3) which causes injury to the plaintiff; and (4) is done without just cause or excuse. *See In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994); *see also In re Paul*, 266 B.R. 686, 696 (Bankr. N.D. Ill. 2001). Malice does not require that the

12

defendant act with "ill-will or a specific intent to do harm." *Thirtyacre*, 36 F.3d at 700. Although courts have determined that a finding of "willfulness" can also be determinative as a finding for "malice," most courts make separate findings on both elements. *See Barboza v. New Form, Inc.*, 545 F.3d 702, 711 (9th Cir. 2008) (requiring courts to make findings on both elements, even though the analysis is duplicative).

While the discussion set forth in *Thirtyacre* reflects a remarkably low standard for "malice," the facts of the case certainly do not. *See Thirtyacre*, 36 F.3d at 699-700. In *Thirtyacre*, the defendant was held liable for assault and battery and a judgment was entered against him for $25,000. *Id.* at 699. The plaintiff's injury arose after the defendant became intoxicated, and struck the plaintiff's neck when she demanded he leave her property. *Id.* In this case, there is no evidence that the defendant's actions towards First Weber were of the caliber deemed "malicious" in *Thirtyacre*. Under the standard articulated in *Thirtyacre*, a preponderance of the evidence must show that the defendant, by receiving the commission, intended First Weber to suffer harm. *See Thirtyacre*, 36 F.3d at 700. At trial the defendant testified that on September 1, 2002, after his agency agreement was cancelled, he believed that he no longer owed any duties to First Weber and that he was free to initiate the sale of the Overlook property. In light of his belief, I am unable to infer that the defendant possessed the requisite level of intent to harm First Weber, set forth in *Thirtyacre*. Unlike an injury arising from assault and battery, an injury sustained by the defendant's alleged breach of his contractual duties does not allow me to logically infer the defendant possessed the requisite intent to injure.

Although much of the evidence was deemed inadmissible at trial, First Weber continued to argue that the defendant's actions regarding the sale of the Overlook property violated state law and the Code of Ethics and Standards of Practice of the National Association of Realtors

13

("Realtor's Code of Ethics"). Violations of state laws are often offered as evidence from which the court is invited to make inferences regarding the defendant's intent. *See In re Wilson*, 216 B.R. 258, 267 (Bankr. E.D. Wis. 1997); *see In re Limbaugh*, 155 B.R. 952, 961 (Bankr. N.D. Tex. 1993); *See In re Adams,* 147 B.R. 407, 415-16 (Bankr. W.D. Mich. 1992). Generally however, courts will only infer a "willful" injury when, the defendant, by violating the state law knows that an injury will occur, and the defendant's conduct is egregious enough to easily fall within the § 523(a)(6) standard. *See Wilson*, 216 B.R. at 268 (defendant's "willful" intent to harm could be inferred from a violation of state law prohibiting an individual from making "deliberate" unwelcomed sexual advances); *see Limbaugh*, 155 B.R. at 960 (court inferred that damages arising from violation of state law, when defendant wrongfully "wiretapped" his ex-wife's conversations with her children for purposes of reducing child support, were nondischargeable under § 523(a)(6)).

Usually courts will not infer that a mere violation of state law gives rise to "willful and malicious" injuries within § 523(a)(6). *See In re Adams,* 147 B.R. at 415-16 (noting that driving without a license, in violation of Michigan law, is not in and of itself evidence that the driver intended a "willful and malicious" injury); *see In re Fate*, 100 B.R. 141 (Bankr. D.Mass. 1989) (driving without automobile insurance may be malicious, but is not willful because the driver's failure to procure vehicle insurance did not necessarily lead to an injury.); *In re Druen*, 121 B.R. 509, 511 (Bankr. W.D. Ky. 1990) (holding that a failure to obtain automobile insurance, does not establish a "willful" injury); *In re Leahy*, 170 B.R. 10, 15 (Bankr. D. Me. 1994) (agreeing with the majority position and finding that a mere failure to carry worker's compensation insurance, against state law, does not fall within the "willful" standard).

14

Like these courts, I cannot infer the defendant's intent from a violation of state law governing real estate transactions, or a violation of the Realtor's Code of Ethics. Even if evidence of such violations by the defendant were admitted, the conduct that gave rise to the violation would not establish, beyond negligence, the defendant's intent to injure First Weber. The plaintiff in this case simply did not demonstrate that the cause of First Weber's claim was an injury rather than a breach of a contract much less that it was willful or malicious.

First Weber failed to prove by a preponderance of the evidence that the defendant acted with a subjective intent to deprive First Weber of its commission, when he participated in the sale of the Overlook property between the Acostas and Call. Accordingly, I conclude that the injury sustained by First Weber was not excepted from discharge under § 523(a)(6). First Weber's complaint is DISMISSED.

Dated: April 26, 2011

ROBERT D. MARTIN
UNITED STATES BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

In re:

Jonathan H. Horsfall,                                                                (Chapter 7)

          Debtor.                                                        Case No. 10-12596

First Weber Group, Inc.

          Plaintiff,

v.                                                                                    Adv. No. 10-00179

Jonathan H. Horsfall

          Defendant.

ORDER

The court having made the findings of fact and reached the conclusions of law contained in the memorandum decision filed on this date, it is hereby ORDERED, that the debt owed by the debtor to First Weber Group, Inc. be discharged. The Complaint filed by First Weber Group, Inc. is DISMISSED.

Dated: April 26, 2011

ROBERT D. MARTIN
UNITED STATES BANKRUPTCY JUDGE